[Civ. No. 2678. Third Appellate District.—December 22, 1924.]

ED. T. SMITH, as Administrator, etc., Respondent, v. SIDNEY J. W. SHARP, Appellant.

[1] TRUSTS—ACCOUNTING—PAYMENTS FOR ACCOUNT OF PLAINTIFF—PRINCIPAL AND AGENT.—In this action for the purpose of having it adjudged that the estate and interest of defendant in certain real property, upon which defendant had held a subordinate lien and which plaintiff had deeded to defendant was held by defendant in trust for plaintiff, and as security for the repayment of moneys owing by plaintiff to defendant, if any, and for an accounting of the rents, issues, and profits arising from said real property, the evidence warranted the conclusion of the trial court that defendant, in paying off the prior liens and mortgages on said property, paying reclamation assessments, etc., was acting for and in behalf of plaintiff and was advancing money for his uses and purposes, and thus created the relationship of principal and agent, and brought matters directly within the terms of section 2219 of the Civil Code.

[2] ID.—ASSUMPTION OF RELATION OF TRUSTEE—SUSPICIOUS TRANSACTIONS—TERMINATION OF TRUST—ABANDONMENT.—Said defendant, so obtaining a deed from plaintiff, having obtained control over the affairs of plaintiff and of all the real estate theretofore belonging to him and of all matters pertaining thereto, assumed the relation of trustee toward plaintiff, and every transaction thereafter by which defendant attempted to acquire title himself in and to the premises must be viewed with suspicion; and such relation of confidence having been established, either some positive act or some complete case of abandonment must be shown in order to determine it.

[3] ID.—AGREEMENT TO RECONVEY—VIOLATION OF TRUST—WRONGFUL ACTS — INVOLUNTARY TRUST. — In such action, the court having

---

1. See 26 R. C. L. 1325.

found, upon sufficient evidence, that prior to the making of the deeds from plaintiff to defendant, the latter agreed to reconvey to plaintiff and, also, to attend to the renting of the land, etc., the defendant, by his attempt to acquire title, brought himself within the terms of section 2224 of the Civil Code, which provides that one "who gains a thing by . . . the violation of a trust, or other wrongful act, is, unless he has some other or better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

[4] ID.—MORTGAGE—EVIDENCE—FINDINGS—VALUE OF PROPERTY.—In such action, the trial court having found, upon sufficient evidence, that the deed from plaintiff to defendant was, in legal effect, nothing but a mortgage, the error, if any, of the trial court in admitting evidence as to the value of the property would not warrant a reversal of the judgment in favor of plaintiff.

[5] ID.—PRELIMINARY HEARING AND FINDINGS—SECOND HEARING—ADDITIONAL EVIDENCE.—Where, upon the conclusion of the first hearing in such action, the trial court prepared and filed findings in favor of plaintiff and ordered the entry of an interlocutory decree and also directed that an accounting be had of the rents, issues and profits of the lands, and thereafter, and without the entry of any interlocutory judgment, the court proceeded to take an accounting, it was error for the court, upon such second hearing, to deny defendant the right to prove the payment by him of certain taxes upon the property because he had failed to make such proof upon the first hearing and those matters were embraced within the findings previously filed.

[6] ID.—CORRECTION OF FINDINGS.—The court may change its findings at any time before judgment without ordering a new trial, and this of its own account.

[7] ID.—AMOUNT DUE DEFENDANT—ERRONEOUS REJECTION OF EVIDENCE—APPEAL—PARTIAL REVERSAL.—In such action, the error of the trial court in refusing to permit defendant, upon the second hearing, to introduce proof as to the taxes paid by him did not necessitate a reversal, on appeal, of the judgment in the case in favor of plaintiff, other than as to the amount of money due from defendant to plaintiff.

---

(1) 2 C. J., p. 954, n. 83. (2) 39 Cyc., p. 103, n. 94. (3) 39 Cyc., p. 172, n. 32. (4) 4 C. J., p. 970, n. 57. (5) 27 Cyc., p. 1858, n. 88. (6) 38 Cyc., p. 1988, n. 96, 99. (7) 4 C. J., p. 1182, n. 28.

APPEAL from a judgment of the Superior Court of Kings County. J. A. Allen, Judge. Affirmed in part and reversed in part.

70 Cal. App.—22

The facts are stated in the opinion of the court.

H. Scott Jacobs, R. Justin Miller and Sidney J. W. Sharp, *in pro. per.,* for Appellant.

J. F. Pryor and H. P. Brown for Respondent.

PLUMMER, J.—This action was brought by the plaintiff against the defendant for the purpose of having it adjudged that the estate and interest of the defendant in and to a certain section of land containing about 635 acres, situate in the county of Kings, state of California, was held by the defendant in trust for the plaintiff, and as security for the repayment of moneys owing by the plaintiff to the defendant, if any, and for an accounting of the rents, issues, and profits arising from said real property. The plaintiff acquired title to the lands in controversy from the state of California during the year 1911, and asserts that his ownership thereof continued down to and including the entire period involved in this action.

The defendant asserts in his answer that he is the owner in fee of said lands, claiming to have acquired title thereto by a constable's deed, made by a constable on September 14, 1916, under a sale of the land theretofore had under execution. The defendant also further claims to have acquired title to the lands involved by reason of a certain quitclaim deed made and delivered to him by the plaintiff on or about the twenty-fourth day of October, 1916. On the part of the plaintiff it is contended that whatever title was acquired to the lands and premises by the defendant, under and by virtue of the constable's deed, was acquired by him for the benefit of the plaintiff, and merely as security for the repayment of moneys advanced by the defendant for the uses and purposes of the plaintiff, and as security for the payment of a certain mortgage note made by plaintiff to defendant and the defendant's brother.

The court found in favor of the plaintiff and directed that an accounting be had of the rents, issues, and profits arising from said real estate, and upon the conclusion of the accounting adjudged that the rents, issues, and profits received by the defendant exceeded the amount of the indebtedness of the plaintiff to the defendant in the sum of $204.89, and directed that the plaintiff have judgment for said amount, and, also,

that the plaintiff was entitled to a reconveyance of the 635 acres.

A review of all the authorities and points discussed by the respective parties in their briefs would extend this opinion beyond all reasonable limits, and will therefore not be undertaken. Two points are set forth prominently, to wit, the existence of a confidential relation between the parties and the effect of the quitclaim deed, dated October 24, 1916, as an absolute conveyance, or, as found by the court, merely a mortgage. If a mortgage, the existence of the confidential relation, whether correctly or incorrectly determined by the court, becomes of no vital importance and we shall therefore treat it only as an incidental matter.

An understanding of the questions involved necessitates a rather full statement of the facts. In this particular the transcript shows the following: The plaintiff began working for the defendant's father in 1908 and continued in such employment until some time during the year 1910, making his home in a store building owned by the defendant's father. In 1910, the plaintiff went to live at the home of the defendant and the defendant's parents, under an agreement by which the plaintiff agreed to pay the defendant's mother the sum of $20 per month for board and lodging. This relationship continued until about February, 1916. In March, 1914, it appears that the plaintiff had become indebted to the defendant's mother in a considerable sum for such board and lodging, and that on or about the fourth day of March, 1914, the plaintiff made and delivered to the defendant and his brother, Craigie S. Sharp, at the request of the defendant's mother, a certain promissory note for $1,500, bearing interest at the rate of ten per cent per annum, payable on or before March 4, 1916, and at the same time, to secure the payment of said note, the plaintiff executed and delivered to the defendant and his brother a mortgage on the 635 acres hereinbefore mentioned, and, also, upon a certain sixteen-acre tract, referred to and known as the "sixteen-acre tract," then owned by the plaintiff. As to the sixteen-acre tract, the mortgage just referred to, created a second lien, said tract at that time being subject to a first mortgage given to one H. V. Brenton to secure the payment of the sum of $1,200 and interest, and as to the 635-acre tract, known as and called the "lake land," the

mortgage given to the defendant and his brother by the plaintiff was subject to a mortgage theretofore given to one John A. Wilson to secure the payment of a promissory note in the sum of $1,835. In July, 1914, the plaintiff conveyed the sixteen-acre tract to the defendant and his brother, Craigie S. Sharp, and the defendant and his brother gave back to the plaintiff an instrument of defeasance. This instrument purported to grant to the plaintiff the right to repurchase or redeem said sixteen-acre tract within eighteen months from the date of the agreement by payment of $3,068.85, together with interest at the rate of ten per cent per annum. This sum was made up of the amount due H. V. Brenton, theretofore the owner of the prior lien upon said sixteen-acre tract and the $1,500 note and mortgage given by the plaintiff to the defendant and his brother, as hereinbefore stated. It appears that Brenton, the holder of the first mortgage on the sixteen-acre tract, had made a proposition to the plaintiff to enter into a similar transaction giving the plaintiff eighteen months to redeem or repurchase said tract, and that after a conference had been had between the defendant and the plaintiff, the defendant agreed to take up the Brenton note and mortgage, and enter into the agreement as herein stated. After the execution of the instruments relating to the sixteen-acre tract had been had, the buildings on said tract burned, and the defendant received as insurance thereon the sum of $250. The plaintiff was not given credit upon his indebtedness for said sum. The plaintiff did not succeed in paying the $3,068.85 necessary to effect redemption of the sixteen-acre tract, and thereafter sale was made of said tract by the defendant for the sum of about $2,600, and thereafter, other than as showing the transactions between the parties and their relationship, the sixteen-acre tract drops out of this case. In August, 1915, the "lake land" was sold by the O'Bryan Reclamation District to one John A. Wilson, the holder of the first mortgage thereon, for the sum of $446.92, on account of an unpaid reclamation district assessment. The right to redeem from this sale would have expired on August 21, 1916. On or about the ninth day of September, 1915, the same land was sold by a constable to one Charles G. Lamberson, for the sum of $516.51, to satisfy a judgment theretofore rendered against the plaintiff. The certificate

of sale was assigned by Lamberson to Wilson. The right to redeem from this sale would have expired on September 9, 1916. The "lake land" was also still subject to the Wilson mortgage and the mortgage given to the defendant and his brother by the plaintiff. On June 8, 1916, in an action brought by the First National Bank of Hanford against the plaintiff, an attachment was levied on the "lake property" for an indebtedness in the sum of $560. On June 21, 1916, the plaintiff executed a mortgage on the "lake lands" to one George H. McKissick, to secure the payment of a promissory note in the sum of $237, and interest thereon. .

On the nineteenth day of August, 1916, the plaintiff executed and delivered to the defendant a quitclaim deed for the sixteen-acre tract hereinbefore referred to, and, at the same time, the plaintiff executed and delivered to the defendant a grant, bargain, and sale deed to the "lake land." This deed bears date of August 12, 1916, but was acknowledged on the nineteenth day of August. It is admitted by the defendant that this last mentioned deed, to wit, the grant, bargain and sale deed covering the 635 acres involved in this action was taken merely as security for the advances about to be made by him. The defendant's testimony in this particular appears as follows: "I also explained that the bargain and sale deed that he was giving me at that time was to protect me on my advances; we had arranged that I should take up the Johnny Wilson mortgage and the other liens that were existing at that time, and this deed was to protect me in taking those up and paying them off and to protect me on my fifteen hundred dollar mortgage; that was the substance as I remember it." During the months of August and September the defendant, either by assignment to himself, or to his brother, Craigie S. Sharp, took over all the liens and mortgages to which we have referred, and the indebtedness then existing against said lands and premises amounting to the sum of about $6,500. The trial court found that the 635 acres of land at the time of the transactions herein referred to was not subject to any other liens or encumbrances except state and county taxes for the year 1916.

After these transactions had been had the plaintiff, on the twenty-fourth day of October, 1916, executed and delivered to the defendant a quitclaim deed, which purported to quit-

claim to the defendant the 635-acre tract. On the part of the plaintiff it is contended that this conveyance was made in pursuance of an oral agreement between the plaintiff and the defendant that it should be executed by the plaintiff and received by the defendant as security for the payment by the plaintiff to the defendant of such moneys as had theretofore been and were thereafter to be loaned to plaintiff by the defendant, or advanced by the defendant for the uses and purposes of the plaintiff, and that said conveyance was so understood by both plaintiff and defendant. On the part of the defendant it is alleged that this quitclaim deed was executed and delivered for the purpose of conveying from the plaintiff to the defendant all the right, title, and interest that the plaintiff might then have in and to said premises, and as an absolute and final conclusion, or as the defendant testified, "a closing out of the whole transaction." The finding of the trial court as to the character of this instrument is, in substance, as follows: That on or about the twenty-fourth day of October, 1916, the plaintiff, at the special instance and request of the defendant, executed said instrument wherein it is recited that the plaintiff remises, releases and forever quitclaims said real property unto said defendant; that said instrument was executed by plaintiff and was received by the defendant under and pursuant to said oral agreement between plaintiff and defendant, and not otherwise, and was executed by plaintiff and received by defendant as security for the repayment by plaintiff to defendant of such moneys as had then been and would thereafter be loaned to plaintiff by defendant and advanced by defendant for plaintiff, together with interest thereon under and pursuant to said oral agreement between plaintiff and defendant, . . . that said instrument was not intended by plaintiff and defendant or by either of them to be an absolute conveyance of said real property or of any part thereof or of plaintiff's estate in said property or in any part thereof; . . . that at the time of the conveyance in question no money or property was paid or transferred to plaintiff in consideration for the execution by plaintiff of said instrument, and that the only consideration for the execution of said instrument by plaintiff was the aforesaid oral agreement on the part of defendant to hold, manage, and preserve said real property and plaintiff's estate therein for plaintiff

and the advancement by defendant of the aforesaid moneys then advanced and thereafter to be advanced by defendant . . . as security for repayment by the plaintiff to the defendant of the sums herein referred to.

It was also found by the court that during all of the period herein referred to, there existed between the plaintiff and the defendant a relation of faith and confidence, which the plaintiff placed in defendant, and by reason of the reliance of the plaintiff upon the defendant in his management and protection of the property herein referred to, he (plaintiff) did not read the quitclaim deed signed and executed by him, dated as aforesaid, October 24, 1916, but believed at the time that he was executing a trust deed. The finding of the court is also to the effect that the value of the property at the time of the execution of the quitclaim deed last herein mentioned was in excess of the indebtedness in the sum of about $4,000.

The finding of the court that the quitclaim deed bearing date of October 24, 1916, was, in legal effect, a mortgage is assailed by the appellant as not supported by the evidence. That the plaintiff, during the month of August, 1916, was making efforts to secure funds to protect his interest in the "lake lands" is clearly evident from the record. The testimony there set forth shows that the plaintiff went to see the defendant about paying the amount of the reclamation assessment; that during this conversation the plaintiff said to the defendant that he had interviewed one Mr. Pryor in regard to securing the money; that Mr. Pryor had made some offer to take up the land, pay the indebtedness, give the plaintiff a certain portion thereof, and that at the conclusion of such conversation, the defendant stated that he would take up the matter; "he said he would take up the Wilson mortgage, the reclamation assessment and the Lamberson certificate." The defendant's own testimony, which we have hereinbefore set forth, is exactly the same in effect, to wit, that he took the grant, bargain, and sale deed to protect him in the advances necessary to be made to pay off the prior liens. In relation to the execution of the quitclaim deed, the defendant further testified: "Mr. Gillespie made me a deed on October 24th, 1916. It was executed in Ed Smith's office, I think. I think probably I prepared the deed. Mr. Gillespie came to my office downstairs. I don't know

whether it was at my request or his own suggestion. I don't know whether I read it to him or not; I know I explained to him what it was; he knew what it was. My answer doesn't say, but I say he understood it. I don't know as a matter of fact whether I read the deed over to him or not. I told him about it at this time; he knew what it was; he knew what he was going to sign. . . . I told Mr. Gillespie at that time that we would close this whole transaction up, and that I would take from him this quitclaim deed which I had there and cancel all our obligations that existed between himself, my mother and my brother and myself, and clean out the whole account, or words to that effect.''

The testimony of Ed. T. Smith, the notary, is, in substance, as follows: ''I didn't pay any particular attention to his physical condition. I knew he was James Gillespie and I asked Mr. Gillespie if that was his signature; and I put my signature on it and handed it to Mr. Sharp.''

The plaintiff's testimony concerning said transaction was: ''Q. Well, now, later on you made a quitclaim deed that is marked in evidence here? A. Yes. Q. To Sidney Sharp; do you recall the circumstances under which that was executed? Do you recall how you came to sign that? A. Yes; I recollect that he asked me to come up there and sign it and I went up and signed it. Q. Just what did he say to you? A. He asked me to sign this paper. Q. He handed you this paper, did he? A. Yes. Q. And did you read the paper at the time? A. No, I did not. Q. And did he explain to you what the paper was? A. No. Q. And did you understand you were—what did you understand you were signing when you signed that paper? A. I understood I was signing a trust deed. Q. A trust deed to Sidney Sharp securing the money which he had put up for you in relation to this land? A. Yes, sir.''

The transcript further shows that at the time of the execution of this quitclaim deed there was no cancellation of the indebtedness from the plaintiff to the defendant; that nothing was turned over by the defendant to the plaintiff evidencing any cancellation of the previous indebtedness, or anything done in relation thereto, further or other than as we have hereinbefore stated. In connection with this testimony, given by the plaintiff and defendant, and as bearing upon the weight to be given to the defendant's version of the transaction, the trial court had a right to take into con-

sideration the verified answer of the defendant and his testimony as to why he took over the Wilson mortgage and paid off the outstanding liens. As we have shown, the defendant testified that he took the grant, bargain, and sale deed, as stated by him in his own language "to protect me on my advances. We had arranged that I was to take up the Johnnie Wilson mortgage and the other liens that were existing at that time and this deed was to protect me in taking those up and paying them off to protect me on my $1,500 mortgage."

R. Justin Miller, a friend of the defendant, before whom the grant, bargain, and sale deed was executed, testified that he informed Mr. Gillespie "what the instrument was that he was asked to sign; that Mr. Gillespie by signing this quitclaim deed was turning over to Mr. Sharp all of his right including his equity of redemption in the sixteen acres and that he was giving this bargain and sale deed by way of further security to Mr. Sharp to recover the amount of the fifteen hundred dollar mortgage, and such other advances as were then necessary to be made in order to protect the mortgage; and Mr. Gillespie signed them in my presence and I took the acknowledgment." (The witness Miller appears to have been the attorney for the defendant.)

The witness Miller further testified "there was nothing said in that conversation about anything other than the relationship of mortgagor and mortgagee as between Sidney Sharp and James Gillespie." Mr. Miller also testified that he was acting as attorney for Sidney Sharp,—"I was advising with him all the way along."

It thus appears that the prior mortgage and liens were agreed to be taken up by the defendant, and to secure the repayment thereof, the plaintiff executed a grant, bargain, and sale deed. Under such circumstances, any act performed by the defendant in relation thereto would be for the uses and purposes of the plaintiff, under and by virtue of the agreement had between the parties preceding the execution of the grant, bargain, and sale deed. It further appears from the testimony that the plaintiff and the defendant in Miller's office had further conversation and agreement as to the amount to be paid and satisfactory to both of them to be paid for taking up some of the liens held by John A. Wilson, the defendant wanting one of the claims cut down, because he thought Wilson was asking too much

for the same, "and it was too much to sting the old man."
In contradistinction to this agreement, which is made clearly
to appear, the defendant, in his verified answer, denies that
he took an assignment of the Lamberson certificate of sale
under any agreement between plaintiff and defendant, but
in this behalf alleges "that he took said assignment for the
purpose of protecting the interest of Craigie S. Sharp and
himself and for the purpose of acquiring the title to said
property for himself and said Craigie S. Sharp"; and that,
by the conveyance executed by the constable, "the defendant
become the owner of said real property jointly with Craigie
S. Sharp; that he procured said deed for the purpose of
protecting his interest and the interest of said Craigie S.
Sharp, and was not acting at any time, or at all for or on
behalf of the plaintiff in the procurement of said deed."
While admitting by his testimony that he was going to take
up said liens for the plaintiff and took the grant, bargain,
and sale deed from the plaintiff to secure him in so doing,
the defendant, in his verified answer, claims that he took
up said liens in order to acquire the title thereto for himself
and his brother. Mr. Wilson, from whom the assignments
were taken, thus gives his version of the affair: "When I
made that assignment of the certificate of sale I was in Mr.
Miller's office, the district attorney's office. Mr. Sharp
asked me to come up, but I was delayed some time; I told
him I would be up one day; I think it was within a day or
two of the time it would expire; I think it would expire the
next day and I told him I would attend to it that day and
I was out of town and delayed in getting there; and some
time in the evening, why, I was telephoned to come up. I
couldn't say whether it was Mr. Sharp or Mr. Gillespie who
telephoned to me, but I think it was Mr. Gillespie. I went
to Sharp's office. Mr. Gillespie and Mr. Sharp were present.
A conversation thereafter took place in my presence between
Mr. Gillespie and Mr. Sharp. It was in regard to this cer-
tificate. Mr. Sharp wanted to know how much I wanted for
the assignment and it occurs to me I told him five hundred
or five hundred and twenty-five dollars, and he said that was
too much, and he asked Mr. Gillespie if he didn't think that
was too much and Mr. Gillespie said yes. Then I asked,
'What's the matter with four hundred dollars? How will
that suit you?' And Mr. Sharp says to Mr. Gillespie, 'Is
that all right?' and he said, "Yes." I says, 'All right. I'll

make the assignment for the four hundred dollars.' '' It was at this time that Mr. Wilson testified ''that Sharp said he didn't think I ought to hold up the old man on account of me only paying two hundred and fifty dollars to Lamberson for it'' (the certificate). Mr. Wilson further testified: ''We had a conversation; it was in regard to making the assignment of the mortgage that I held against Mr. Gillespie. I don't believe Mr. Gillespie was there then; I won't be sure of that. Mr. Sharp made a statement at that time as to why he wanted the mortgage; he said he wanted to get things so that he could collect his interest and he would take care of Gillespie.''

The court, as we have stated, found that there was a confidential relation between the plaintiff and the defendant during all the times of these transactions, and, also, further found in substance that the plaintiff was advanced in years and was illiterate, not conversant with legal procedure or legal instruments. This finding is also assailed by the appellant, but evidence in the transcript shows that the plaintiff was advanced in years, and that he was illiterate, the following letters written by him abundantly demonstrate:

''Hanford March 27 1916 S. J W Sharp Dear Friend yours received and contents noted I have two parteys that is figren on the place one is estren party and the other one I ben on hand for a time his brother wants him to thak the place So you better post pond your trip for a week after the first of the month I will no Some thing defent before that time I want it to gow as Soon as pasable and get it off my mind it maike me feale blue I hope I will have Somthing that will chear us up in my next letter I dewing the best I can at present time yours truly James Gillespie,'' and

''Hanford March 15 1916 S J W Sharp Dear Friend your at hand and contens noted this is the second letter I got from you I have been trying hard to get the deal stratend out and got a nuff out to pay your mother as well as you and your brother but on the count of the house brunt up it is a draw back to me but I offer two hundred of for the house not thare and I may have to give more off if it is agreeable as I want to get it stranted out I did not have much to report but I will get thing it fixed as Soon as I can now the Lak land is gown under a gaine that is why I want to get the three thousand as near as I can So you and your mother will

get all but but if I have to thro of Som to maike the saile I maike it as little as I can now Mr. Sharp have as much pashens as can with me as I am dewing the best I wating Every to be able to report to you and I did mean to dis regard bening courtest in any to you I did not offiic as Soon as I should of done you Se that thay was on the eave Sending back I hope you will for give me this time and I will dew so no mor I cant Sea anny other way and present for your mother to get her money and I want her to get all her money and I want to have it if I am left a beger I have a rather hard tim to get a long Sence I was sent out I slep in the barn on the floor but I will trye offel har to get it Sold if I have to loose Som I will try and maike it up Som way if I dew I will close and I hope you will for give me and I will dew the best I can   Yours truley   James Gillespie.''

[1]   The testimony which we have hereinabove set forth, we think, warranted the conclusion of the trial court that the defendant, in paying off the prior liens and mortgages, paying reclamation assessments, etc., was acting for and in behalf of the plaintiff and was advancing money for his uses and purposes, and thus created the relationship of principal and agent, and brought matters directly within the terms of section 2219 of the Civil Code, which reads: ''Everyone who voluntarily assumes a relation of personal confidence with another is deemed a trustee, within the meaning of this chapter, not only as to the person who reposes such confidence, but also as to all persons of whose affairs he thus acquires information which was given to such person in the like confidence, or over whose affairs he, by such confidence, obtains any control.''   [2]   There is no question but that the defendant, so obtaining a deed, obtained control over the affairs of the plaintiff and of all the real estate theretofore belonging to him, and of all matters pertaining thereto. Having assumed that relation, every transaction thereafter by which the defendant attempted to acquire title in himself in and to the premises would necessarily be viewed with suspicion.   There appears nothing in the transcript tending to show any change in the relations between the plaintiff and the defendant prior to the execution of the quitclaim deed. We think the rule set forth in 2 Pomeroy's Equity Jurisprudence, fourth edition, section 956, applicable: '' . . . that where a relation of confidence is once established, either

some positive act or some complete case of abandonment must be shown in order to determine it. The mere fact that the relation is not called into action is not, I think, sufficient of itself to determine it, for this may well have arisen from there having been no occasion to resort to it." [3] The plaintiff further testified that prior to the making of the deeds in question the defendant agreed to reconvey to him, and, also, to attend to the renting of the land, etc. And the finding of the court being that this is true, the defendant, by his attempt to acquire title, brings himself within the terms of section 2224 of the Civil Code, which reads: "One who gains a thing by fraud, accident, mistake, undue influence, *the violation of a trust, or other wrongful act,* is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." In this particular, we do not need to refer to authorities other than that as they appear appended to said section in Kerr's Cyc. Codes. Section 2924 of the Civil Code further provides that every transfer of property made as security, other than a trust, is deemed to be a mortgage.

[4] It is further contended on the part of the appellant that the court erred in the admission of testimony relative to the value of the 635 acres. At the time the transactions hereinbefore referred to were had the land was submerged, and no crops had been raised thereon for a considerable period of time. Reclamation works were being carried on, and, as the testimony shows, during the years 1918, 1919, and 1920, crops aggregating a net return of more than $10,000 in value were obtained therefrom. We do not need to set forth anything in relation to the alleged error as to the admission of testimony concerning the value of the land, because we think, irrespective of value, the testimony sustains the finding of the court that the quitclaim deed, dated October 24, 1916, was, in legal effect, nothing but a mortgage, and if the court erred in relation to the admission of testimony as to the value of the land at that time, it would not warrant a reversal of the judgment herein. [5] Upon the conclusion of the first hearing in this case, the court prepared and filed findings, as we have hereinbefore stated, and ordered the entry of an interlocutory judgment, and, also, directed that an accounting be had of the rents, issues and profits of said lands and premises. Thereafter, and

without the entry of any interlocutory judgment, the court proceeded to take an accounting, and filed supplemental findings. In so doing, the court found that the defendant had paid out items, including interest thereon, up to the twenty-third day of August, 1920, $10,532.30, and that the defendant had received as net rents, issues, and profits of the lands, including the sum of $10,737.19, being an excess of the sum of $204.89, and for a reconveyance of the said 635 acres of land.

Upon the second hearing the defendant offered and attempted to prove that on June 24, 1916, he paid taxes in the sum of $68.02 on account of assessments levied during the year 1915, together with interest amounting to the sum of $102.13, and, also, that on October 17, 1916, he paid taxes in the sum of $52.39, which, together with interest, amounted to the sum of $76.24, aggregating the total sum paid as taxes and interest thereon of $178.37. These items the court refused to allow on the ground that those matters were settled by the findings already filed. In this the court was in error. [6] It appears to be settled law in this state that the court may change its findings at any time before judgment without ordering a new trial, and this of its own motion. (*Spaulding* v. *Howard,* 121 Cal. 194 [53 Pac. 563]; *Smith* v. *Taylor,* 82 Cal. 533 [23 Pac. 217]; *Hayes* v. *Wetherbee,* 60 Cal. 396.)

The payment of taxes is a matter of absolute proof and it does not appear that any objection was made upon any ground other than that such items had not been considered when inquiring into expenditures made by the defendant preceding the ordering of an accounting as to defendant's profits derived from the lands in controversy after the execution of the quitclaim deed. As no judgment had been entered the court was still in a position to make findings in accordance with the facts and to correct its findings to conform with the facts.

[7] This error, however, does not necessitate a reversal of the judgment in this case other than as to the amount of money found due from the defendant to the plaintiff. It is therefore ordered that the judgment in this case be affirmed as to all matters contained therein, save and except the amount of $204.89, awarded to the plaintiff, and as to this portion of the judgment a new trial is granted, and the trial court directed to proceed and ascertain the amount of taxes

paid by the defendant from which he has not been given credit, and deduct the same from the money judgment awarded the plaintiff, unless the plaintiff herein, or his representative in interest, within thirty days after the going down of the *remittitur* herein, consents to the reduction of said money judgment in the sum of $178.37, with interest thereon at the rate of seven per cent per annum from the date of the entry of the judgment heretofore entered in this case in favor of the plaintiff and against the defendant, and in the event that satisfaction of the money judgment in said amount is entered within said thirty days, then and in that case the judgment in this cause, and the whole thereof, stands affirmed, the appellant to recover his costs on appeal.

Hart, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 19, 1925.

All the Justices concurred.